**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| In re: | x<br>:<br>: | Chapter 11 |
| THE KASDEN FUEL COMPANY, | :<br>: | Case No. 10-21973 (ASD) |
| Debtor | :<br>: | |
| | x | |
| | x<br>: | |
| HMZ ENERGY, LLC, | :<br>: | |
| Plaintiff | :<br>: | Adv. Pro. No. 10-02183 (ASD)<br>(Lead/Main Case) |
| v. | :<br>: | |
| SACK DISTRIBUTORS CORP & THE<br>KASDEN FUEL COMPANY., | :<br>:<br>:<br>: | |
| Defendants. | x | |
| | x<br>: | |
| THE KASDEN FUEL COMPANY, | :<br>: | |
| Plaintiff/Objector | :<br>: | Adv. Pro. No. 10-02362 (ASD) |
| v. | :<br>: | |
| SACK DISTRIBUTORS CORP., | :<br>: | |
| Defendant. | :<br>: | |
| | x | |

**MEMORANDUM OF LAW OF DEFENDANT, SACK DISTRIBUTORS CORP.,**
**IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT**

Sack Distributors Corp. ("Sack") hereby submits this Memorandum of Law in

Opposition to the Motions for Summary Judgment that have been filed by HMZ

Energy, LLC ("HMZ") and James A Beldner, Chapter 11 Trustee of the Kasden Fuel

Company, in the above-captioned adversary proceedings.

In support of its opposition to summary judgment, Sack filed the following

affidavits with the Court on April 26, 2011 pursuant to the Court's April 11, 2011

Scheduling Order:

1.      Affidavit of Stephen Sack, Jr., in Opposition to Motion for Summary

Judgment ("Sack Aff.");

2.      Affidavit of Matthew Ide ("Ide Aff."); and

3.      Affidavit of Irve J. Goldman ("Goldman Aff.").

**COUNTERSTATEMENT
OF THE FACTS**

The agreements at issue in these proceedings are a Commercial Reserve

Credit Agreement and Note, dated December 14, 2000 (the "Sack Note") and an

accompanying Commercial Security Agreement, also dated December 14, 2000

(the "Sack Security Agreement"). The Sack Note and Sack Security Agreement

were entered into by Sack and The Kasden Fuel Company ("Kasden") in recognition

of Kasden's virtually exclusive reliance on Sack for fuel purchases on credit and

expected reliance on Sack for future credit ("Sack Aff. ¶¶ 5, 6). As of the date of the

Sack Note and Sack Security Agreements, Kasden's outstanding unpaid balance

with Sack for fuel purchases was $1,985,000 (Sack Aff. ¶5).

For Sack's benefit, an initial "Credit Limit" for Kasden was established at $2

million (Sack Note ¶ 3; Sack Aff. ¶ 7). Although at the time of execution of the Sack

2

Note and Security Agreement, Kasden's outstanding balance with Sack was only $15,000 less than the "Credit Limit" established in ¶ 3 of the Sack Note, the parties contemplated that Sack could make future Advances to Kasden at Sack's discretion (Sack Note ¶ 4). Pursuant to ¶ 5 of the Sack Note, such Advances could be made by Sack "up to the Credit Limit *approved for* [Kasden]."  (emphasis added).

Within two weeks of execution of the Sack Note and Sack Security Agreement, the amount of credit extended by Sack to Kasden exceeded the $2 million "Credit Limit" set forth in ¶3 of the Sack Note by approximately $500,000 (Sack Aff. ¶11), and it steadily grew thereafter (Sack Aff. ¶ 12).

Although ¶ 8 of the Sack Note provides that all unpaid advances outstanding as of five years from the date of the Sack Note must be repaid by Kasden at that time, it does not provide that the Sack Note or Sack Security Agreement would terminate in five years or that further advances or re-advances could not be made after that time.  The only provisions in the Sack Note dealing with termination are paragraphs 9 and 19.

Paragraph 9 of the Sack Note provides that if Kasden wishes "to terminate this Agreement," it could "pay the balance in full and send [Sack] notice of [Kasden's] intention to terminate in the manner set forth in paragraph 19" *(emphasis added)*.  Paragraph 19 of the Sack Note states that Kasden "may terminate this Agreement at any time by paying [Sack] in full all outstanding Advance balances and unpaid FINANCE CHARGES and other charges that [Kasden ] owe[s] under

3

this Agreement and by sending [Sack] written notice of such intention with [Kasden's] payment."

Kasden never exercised its right to terminate under the Sack Note (Sack Aff. ¶15), but rather, continued to request additional credit from Sack well after December 2005 (Sack Aff. ¶ 15). Sack continued to supply Kasden credit pursuant to those requests up until April 4, 2010 without interruption (Sack Aff. ¶ 14).

The Sack Security Agreement provides that Sack is granted a security interest to secure payment and performance not only of the "Loan," which is defined as the indebtedness of Kasden to Sack under the Sack Note,[1] but also,

> all other liabilities and obligations of Borrower to Lender of every name and nature whatsoever, direct or indirect, absolute and contingent, now existing, whether as maker, debtor, guarantor, surety, endorser, pledgor, or otherwise (hereinafter called the "Liabilities").

(Sack Security Agreement p. 1). The immediately succeeding sentence provides:

> It is the true, clear and express intention of the Borrower that the continuing grant of this security interest remain as security for payment and performance of the Liabilities, now existing and whether or not, such Liabilities are related to the transaction described in Schedule A, by class, or kind, **or** whether or not contemplated by the parties at the time of the granting of this security interest.

(Sack Security Agreement p. 1) (emphasis added).

---

[1] The Sack Security Agreement states that Kasden "**is** indebted to . . . Sack . . . in the amount of" $2 million, "which indebtedness is evidenced by" the Sack Note (Sack Security Agreement p. 1 (emphasis added). At the time the parties entered into the Sack Note and Sack Security Agreement, Sack had not approved a Credit Limit for Kasden in excess of $2 million, but subsequently approved increases in Kasden's Credit Limit as a matter of course whenever Kasden requested additional credit (Sack Aff. ¶13).

Although the words, "or hereinafter incurred," do not appear immediately following the words, "now existing," the passage in question expressly includes as Liabilities those that are "not contemplated by the parties at the time of the granting of this security interest."  The use of the disjunctive, "or," to separate the terms, "now existing," from the alternative introduced by the word, "or," clearly indicates that the terms, "now existing," do not modify the remainder of this passage.  In other words, the Liabilities covered by the Sack Security Agreement are not limited to those "now existing."  Thus, to the extent they were not contemplated at the time the security interest was granted, future advances over and above the $2 million "Credit Limit" set forth in ¶ 3 of the Sack Note or advances made after December 14, 2005 would be covered by this provision.

As further evidence of the parties' intention that the Sack security interest would extend to advances made after December 2005 and to credit extended over and above $2 million, the Deitches, on behalf of Kasden, expressed no opposition when Stephen Sack, Jr. stated on several occasions after December 2005, in their presence, that Sack would agree to subordinate its lien against Kasden's assets to any new financing Kasden might obtain (Sack Aff. ¶ 15; Ide Aff. ¶6).

### APPLICABLE
### SUMMARY JUDGMENT
### STANDARDS

As succinctly stated by the Second Circuit Court of Appeals, "[s]ummary judgment is only proper in contract disputes if the language of the contract is wholly unambiguous."  Lucente v. International Business Machines Corp., 310 F. 3d 243,

257 (2d Cir. 2002). "When the language of a contract is susceptible to different interpretations and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment." Id.

More generally, summary judgment is only proper "where there is no genuine issue of material fact to be tried and the facts as to which there is no issue warrant judgment for the moving party as a matter of law." Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.), 574 F. 3d 129, 151 (2d Cir. 2009). It follows that the court's function in considering a summary judgment motion "is not to resolve disputed issues of fact but only to determine whether, as to any material issue, a genuine factual dispute exits." Id.

Summary judgment is not properly granted "[w]hen the party against whom summary judgment is sought comes forth with affidavits or other material obtained through discovery that generate uncertainty as to the true state of any material fact...." Id. In other words, "[s]ummary judgment is inappropriate when the admissible materials produced in opposition to the summary judgment motion make it arguable that the claim has merit" Id.

In reviewing the record on a motion for summary judgment, the court must "give credence to the evidence favoring the non-movant, as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." Id. at 152. See also Davidson v. City of Bridgeport. 2011 WL 1304436, at *4 (D. Conn. Mar. 31, 2011)

6

("the non-movant's evidence must be accepted as true for purposes" of a motion for summary judgment).    In addition, "the court considering a summary judgment motion must disregard all evidence favorable to the moving party that the jury is not required to believe." Dana Corp., 574 F. 3d at 152.

## ARGUMENT

### I.
### THE SACK NOTE AND SACK SECURITY AGREEMENT, AS AMPLIFIED BY THE SURROUNDING CIRCUMSTANCES AND COURSE OF PERFORMANCE OF THE PARTIES, PROVIDE THAT THE ENTIRETY OF SACK'S CLAIM IS SECURED

An issue concerning the existence or scope of a security interest may be determined by examining all relevant loan documents. See Hoffman v. Schlegel (In re S.O.M.B., Inc.), 1995 WL 542512, at * 1-2 (Bankr. D. Conn. Aug. 21, 1995). See also Sherman v. The Shetland Co. (In re The Shetland Co.), 1992 WL 333903, at * 6-7 (D. Mass. Oct. 2, 1992) (reading note and security agreement together in determining security interest covered future advances, and stating that "[c]ourts have considered it appropriate to read documents together when the documents either have been executed as part of a whole, or when they include internal cross references").

The language in a security agreement must be interpreted according to fundamental principles of contract law, which provide that the intention of the parties is controlling. Cabaret Inc. v. Martin and Archambault Limited Partnership, 1992 WL 280615, at * 2 (Conn. Super. Ct. Oct. 5, 1992). The parties' intent "is

7

determined from the language of the agreement in light of the situation of the parties and the circumstances of the transaction." Id.

As more fully explained below, based upon the definition of "security agreement" under Article 9 of the Uniform Commercial Code, as adopted in Connecticut,[2] a court may also consider "course of performance" in determining the scope of the agreement. C.G.S. §42a-9-201(a) provides that "[e]xcept as otherwise provided in this title, a security agreement is effective according to its terms between the parties, against purchases of the collateral and against creditors." (emphasis added). It is "otherwise provided" by the definition of "agreement" in §1-201 of the Uniform Commercial Code, which is part of the definition of "security agreement" contained in C.G.S. §42a-9-102(73), that "course of performance" may be considered in determining the effectiveness or scope of a "security agreement."

C.G.S. §42a-1-201(3) defines "agreement" as "the bargain of the parties in fact, as found in their language or inferred from the circumstances, including course of performance, course of dealing or usage of trade as provided in Section 42a-1-303." It has been held that the definition of "agreement" in §1-201 of the UCC applies to the term, "security agreement," as used in Article 9. See General Capital

---

[2]   It is submitted that Article 9, as revised and adopted in Connecticut in October 2001, applies to the current dispute. C.G.S. §42a-702(a) provides that "[e]xcept as otherwise provided in this part, public act 01-132 applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before October 1, 2001." Although C.G.S. §42a-9-709(a) provides that former Article 9 will apply to priority disputes "if the relative priorities of the claims were established before October 1, 2001, "the only cases in which the rules of former Article 9 may determine the relative priority of conflicting interests are those in which both interests existed before the effective date." 9C Hawkland UCC Series §9-709:2 [Rev.]. In this case, the interests of both HMZ, as assignee of the New Alliance security interest, and the Trustee as lien creditor, arose after October 1, 2001.

Commercial Automotive Finance, Inc. v. Spartan Motors, Ltd., 246 A.D.2d 41, 51, 675 N.Y.S.2d 626, 633 (2d Dept. 1998) (the "terms of a security agreement may be amplified by 'other circumstances including course of dealing or usage of trade or course of performance'," quoting UCC-1-201[3]); National Livestock Credit Corp. v. G. W. Schultz, 653 P.2d 1243, 1247 (Ct. of Appeals Okla. Div. No. 2 1982) (definition of "agreement" in UCC §1-201 applies to "security agreement" and thus "a certain course of performance can result in a waiver of an express term in a security agreement."); Woonsocket Tire Sales, Inc. v. Dowling (In re Rite-Cap, Inc.), 7 B.R. 113, 115 (Bankr. D.R.I. 1980) (definition of "agreement" in UCC § 1-201(3) applies to "security agreement.").   See also C.G.S. §42a-9-102(73) ("'security agreement' means an agreement that creates or provides for a security interest.'") (*emphasis added*).

A "course of performance" is defined as follows:

> (a) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:
>
> > (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
> >
> > (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

C.G.S. § 42a-1-303(a)(1).

C.G.S. §42a-1-303(e) provides, in pertinent part, that "the express terms of an agreement and any applicable course of performance . . . must be considered

whenever reasonable as consistent with each other," but "[i]f such a construction is unreasonable: (1) Express terms prevail over course of performance . . . ; (2) course of performance prevails over course of dealing and usage of trade."

C.G.S. §42a-1-303(e)(1)(2).

Addressing first, the situation the parties and the circumstances of the transaction, it is clear that the overriding reason that Sack was granted a security interest in Kasden's assets was because Kasden had become reliant on Sack as its exclusive supplier of fuel on credit, which was expected to continue in the future (Sack Aff. ¶6). This reason continued to exist and, if anything, became even more compelling as Kasden's outstanding balance with Sack continually increased from December 2000 to April 2010 (Sack Aff. ¶¶11, 12, 14, Exhibits D, E).

Thus, given the circumstances of the parties at the time of execution of the Sack Note and Sack Security Agreement, it is unreasonable to conclude that they actually intended for Sack to be completely unsecured for any credit it extended in excess of $2 million or for credit it extended after December 2005. It may be that at the time of execution of the Sack Note and Sack Security Agreement, the parties did not contemplate Sack extending more than $2 million in credit or credit after December 2005, but there is a specific provision in the Sack Security Agreement which makes liabilities that are "not contemplated by the parties at the time of the granting of this security interest," subject to Sack's security interest.

With respect to credit extended by Sack and accepted by Kasden after December 14, 2005, the Court should also consider that Kasden had the

opportunity to terminate the Sack Note under either paragraph 9 or 19 thereof when it finally paid off the advances that were outstanding as of December 14, 2005, but failed to provide the written notice required by those paragraphs (Sack Aff.¶15). Sack never took any action to terminate the Sack Note or Sack Security Agreement either.  (Sack Aff.¶15).  Rather, the parties continued to conduct business as they had previously, thereby evidencing their intent to treat the Sack Note and Sack Security Agreement as a revolving credit facility and to continue Sack's security interest in effect for any advances or re-advances made after December 14, 2005.

The parties' course of performance further supports an interpretation of the Sack Note and Sack Security Agreement which extends Sack's security interest to its current claim.  Within weeks after the Sack Note and Sack Security Agreement were signed, Sack's extension of credit to Kasden exceeded the $2 million Credit Limit set in ¶3 of the Sack Note by $500,000, and it steadily increased during the five-year period which HMZ maintains is the term of the Sack Note (Sack Aff. ¶¶11, 12).   After December 14 2005, the parties continued to conduct their sales transactions in the exact same manner in which they were conducted during that five-year period, without any termination notice ever having been issued by Kasden as required by ¶¶9 and 19 of the Sack Note.  This course of performance evidences the parties' intent to treat the Sack Note and Sack Security Agreement as a revolving credit facility, whereby Sack could continue extending credit at Kasden's request after December 14, 2005 and remain secured for all transactions occurring

11

after that date, notwithstanding the eventual payment by Kasden of whatever its unpaid outstanding balance was as of December 14, 2005.

It is reasonable to construe the parties' course of performance as consistent with the Sack Note and Sack Security Agreement, C.G.S. §42a-1-303(e), because: (1) ¶¶4 and 5 of the Sack Note are reasonably construed to provide for increases in Kasden's Credit Limit at Sack's discretion, inasmuch as the words, "approved for me," following the reference to Kasden's "Credit Limit," must be taken to mean that Sack could approve a higher "Credit Limit" for Kasden, or otherwise, they would constitute mere surplusage.  See Tilley v. Anixter Incorporated. 332 B.R. 501, 512 (D. Conn. 2005) (Connecticut courts frown "on interpreting a contract in a way that renders a clause in the contract mere surplusage and inoperative"); Gerardo v. Laraia, 2001 WL 283019, at * 9 (Conn. Super. Ct. Feb. 6, 2001) ("'A court must attempt to give meaning to every word of a contract'.") (quoting Downs v. National Casualty Co.. 146 Conn. 490, 495, 152 A.2d 316 (1959)); (2) there is no term of expiration set forth in either the Sack Note or Sack Security Agreement, but merely a promise by Kasden to pay off "the entire unpaid balance of any Advances under the Account, together with any FINANCE CHARGES and other charges then owing, five years from the date of this Agreement." (Sack Note ¶8) (emphasis added). Thus, ¶8 of the Sack Note is most reasonably interpreted as simply a promise by Kasden to pay, in full, whatever was outstanding to Sack as of five years from the date of the Sack Note, not as a provision precluding further advances or re-advances after December 14, 2005 or terminating the effective revolving credit

facility that was established by the Sack Note and Sack Security Agreement; and (3) even if the Sack Note is considered not to have contemplated advances in excess of $2 million and credit extensions after December 14, 2005, the provision in the Sack Security Agreement extending the security interest to any and all liabilities and obligations not contemplated by the parties at the time of the granting of the security interest (Sack Security Agreement p. 1) is properly construed to encompass Sack's current claim (See infra. pp 14-15 for further analysis).

Under the interpretation advanced by Sack above, all advances made by Sack after December 14, 2005 and that remain unpaid should be deemed secured by the terms of the Sack Note, Sack Security Agreement and Sack's UCC-1 financing statement,[3] as amplified by the parties' course of performance. When a security agreement provides for future advances, any additions or extensions beyond a maximum amount established by an accompanying line of credit should be secured as well. See In re Enfolinc, Inc., 233 B.R. 351, 355 (Bankr. E.D. Va. 1999) ("[t]here is authority which has found that despite the fact that an original agreement acts as a line of credit, any additions or extensions beyond the line of credit are also covered by the security agreement if the security agreement contains a future advance clause.")

Further support for the result advanced by Sack is found in In the Matter of Lackow Brothers, Inc., 22 B.R. 1018 (Bankr. S.D. Fla. 1982). There, a note

---

[3] Sack's UCC-1 financing statement is on file with Court as part of its proof of claim filed on September 16, 2010 and accordingly may be considered by the Court on a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A).

delivered by the debtor along with two security agreements stated that it was "for the maximum sum of $500,000, and is intended to evidence all advances made to the undersigned on a revolving basis up to that amount, which advances are secured (in accordance with an Inventory Loan Security Agreement) by all present and hereafter acquired inventory ...; all of the above securing present and future advances ...." Id. at 1020.

Notwithstanding the monetary limitation in the note, the court held that advances up to $1,383,004.79, id. at 1020, were secured based on language in the security agreements stating that "all loans or advances ... whether evidenced by such promissory note or not" would be secured. Id. at 1021. The court also considered relevant a provision in several related commercial loan agreements between the parties stating that "all indebtedness and obligations of Borrower ... under this and under all other agreements, present and future," would be secured. Id.

The language in the Sack Note and Sack Security Agreement is also properly construed as providing for future liabilities such as Sack's current claim. The Sack Security Agreement states that in addition to the Sack Note, "all other liabilities and obligations of Borrower to Lender of every name and nature whatsoever ..." would be secured (Sack Security Agreement p. 1). Although this language is followed by a listing of the types of "other liabilities and obligations" that are to be covered by the Sack Security Agreement, i.e., "direct or indirect, absolute and contingent, now existing, whether as maker, debtor, guarantor, surety,

14

endorser, pledgor or otherwise," there is nothing to indicate that this is an exclusive,

as opposed to exemplative, listing of those "other liabilities and obligations."

Indeed, in the very next sentence, the parties expressed their intent that the security

interest would cover liabilities which were not even contemplated by them at the

time the security interest was granted.    Such an expressed intent would, by

necessity, have to include future liabilities for credit extended in excess of $2

million[4] or after December 14, 2005 because the only liability that existed and

therefore, that could have been "contemplated" by the parties as of the granting of

the security interest, was the Sack Note.

Therefore, in accordance with the decisions in <u>Enfolinc</u> and <u>Lackow Brothers</u>,

the current outstanding indebtedness of Kasden to Sack, consisting of advances

made or credit extended after December 14, 2005 in an amount exceeding $2

million should be considered secured.    Since Sack has not filed a cross-motion for

summary judgment, however, the motions for summary judgment against Sack

must be denied.    As Sack has amply demonstrated, at a minimum, the terms of the

Sack Note and Sack Security Agreement, combined with the parties' course of

performance, are not so "clear and definitive"[5] as to permit the conclusion, as a

---

[4] It is Sack's principal contention that the Sack Note does contemplate advances in excess of $2 million by the provision for the approval of a "Credit Limit" for Kasden (Sack Note ¶3), as amplified by the parties' course of performance.    Even if the Court concludes otherwise, however, such excess advances would then not have been contemplated at the time the security interest was granted, but nonetheless would be subject to Sack's security interest by the provision securing liabilities that were not contemplated by the parties.    The same reasoning applies to advances made after December 14, 2005.

[5] The Connecticut Appellate Court has stated that with respect to credit documents, "[w]here...there is clear and definitive contract language, the scope and meaning of that

matter of law, that Sack's claim is completely unsecured. Accordingly, as instructed by the Second Circuit, "[w]hen the language of a contract is susceptible to different interpretations and there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment." Lucente v. International Business Machines Corp., 310F. 3d 243, 257 (2d Cir. 2002).

## II.
## THE SACK NOTE
## AND SACK SECURITY AGREEMENT
## WERE MODIFIED BY THE CONDUCT OR COURSE
## OF PERFORMANCE OF THE PARTIES

"[I]t is well established that a written contract may be *modified* by the parties' post-agreement 'course of performance'." General Electric Capital Commercial Automotive Finance, Inc., v. Spartan Motors, Ltd., 246 A.D. 41, 52, 675 N.Y.S. 2d 626, 634 (2d Dept. 1998) (*emphasis original*),  In General Electric, this principle was applied to a security agreement to hold that despite the written terms of the agreement prescribing "a single method of inventory-financing (i.e., GMAC's payment to Spartan's sellers in advance of the purchase transaction)," GMAC's occasional reimbursement of Spartan for its inventory purchases after they were made was considered a course of performance that modified the parties' security agreement. Id. at 51-52, 633-34. This modification enabled GMAC to retain a purchase-money security interest for these post-transaction reimbursements. Id.

---

language is not a question of fact but a question of law...." Emigrant Mortgage Co. v. D'Agostino, 94 Conn. App. 793, 799 (Conn. App. 2006), *cert. denied*, 278 Conn. 919 (2006).

Similarly, in RBC Nice Bearings, Inc., v. SKF USA, Inc., 2010 WL 6121707 (Conn. Super. Ct. July 23, 2010), the Superior Court held that a provision in the parties' sales and supply agreement requiring the purchaser to purchase a minimum annual volume or dollar amount of product was modified by the parties' course of performance, which reflected "an agreement to set the amount of product to be purchased at a level consistent with SKF's reasonably foreseeable business needs." Id. at *5.

The analysis and holding in RBC Nice Bearings is consistent with the well established authority in Connecticut that "[m]odification of a contract may be inferred from the attendant circumstances and conduct of the parties." Herbert S. Newman and Partners, P.C. v. CFC Construction Limited Partnership, 236 Conn. 750, 762, 674 A.2d 1313, 1320 (1996). See also Shelton v. Olonosoyo, 125 Conn. App. 286, 292, 10 A.3d 45 (2010); Torgenson v. Kenny, 97 Conn. App. 609, 616, 905 A.2d 715, 719 (2006). Cf. Marine Transport Lines, Inc. v. International Organization of Masters, Mates and Pilots, 878 F.2d 41, 45 (2d Cir. 1989) ("[a]n agreement to modify a contract may be proven circumstantially by the conduct of the parties.") (New York law); Rhythm & Hues, Inc. v. The Terminal Marketing Company, Inc., 2004 WL 941908, at *13 (S.D.N.Y. May 4, 2004) ("under New York law, it is well established that a written contract may be modified by the parties' post-agreement course of performance."). "Whether the parties to a contract intended to modify the contract is a question of fact," Herbert S. Newman and Partners, 236 Conn. at 762, "which would preclude summary judgment."

<u>Drummond American LLC v. Share Corporation</u>, 2009 WL 3838800 at * 8 (D. Conn. Nov. 12, 2009)[6].

Here, even if the Court concludes that the language of the Sack Note and Sack Security Agreement does not support a security interest for Sack's claim, the parties' course of performance, as previously detailed (see supra. pp. 11-12), creates a genuine issue of material fact as to whether they intended to modify the Sack Note and Sack Security Agreement to secure credit extended in excess of $2 million and after December 14, 2005.    Summary judgment must therefore be denied.

HMZ has suggested that any post-agreement modification would be unenforceable under Article 9 because of the requirement that a security agreement be "authenticated," C.G.S. §42a-9-203(b)(3)(A), or under the predecessor statute, "signed" by the debtor.    C.G.S. §42a-9-203 (superseded) (HMZ Memorandum of Law Re Status Conference pp. 6-7).    This argument cannot withstand proper legal analysis.

It is a fundamental rule of statutory construction that:

> "in cases in which more than one statutory provision is involved, [courts] presume that the legislature intended those provisions to be read together to create a harmonious body of law and...construe the provisions, if possible, to avoid conflict between them."

---

[6] In <u>Drummond</u>, evidence of a post-agreement modification did not preclude summary judgment because the contract at issue contained both a merger clause and a provision requiring any amendment or alteration to the contract to be in writing. <u>Drummond</u>, 2009 WL 3838800, at * 7-8.    Neither the Sack Note nor the Sack Security Agreement contains a merger clause or a provision requiring any modification or amendments to be in writing.

Peruta V. Hartford Parking Authority, 2010 WL 3169369, at * 4 (D. Conn. Aug. 10, 2010) (quoting DiLeto v. Cnty. Obstetrics & Gynecology, 2010 WL 2471998, at * 18 (Conn. June 29, 2010)).

C.G.S. §§42a-1-201(3) and 42a-9-102(73) expressly provide that the course of performance of parties to a security agreement may be considered in determining the meaning of their security agreement. The "course of performance" to be considered in that context is a "sequence of conduct between the parties." 42a-1-303(a)(1).   Because a "sequence of conduct" is not capable of being "authenticated" or "signed," the only way in which to read the statutes together is to conclude that as long as there is some writing between the parties that is "authenticated" or "signed" by the debtor, the parties' course of performance under that authenticated or signed writing may be considered in determining its meaning.

III.
### ANY LIMITATION OF KASDEN'S CREDIT LIMIT
### OR THE TIME PERIOD FOR EXTENSIONS
### OF CREDIT UNDER THE SACK NOTE
### WAS WAIVED BY SACK

As a general rule, "'a party for whose benefit a provision in a contract is intended may waive his rights under such provision.'" Fisher Skylights, Inc. v. CFC Construction Limited Partnership, 1993 WL 299053, at * 5 (D. Conn. July 22, 1993) (quoting Lanna v. Greene, 175 Conn. 453. 457 (1978)). The waiver for this purpose "'need not be express, but may consist of acts or conduct from which a waiver may be implied.  In other words, waiver may be inferred from the circumstances if it is

reasonable to do so.'" Id. (quoting Wadia Enterprises, Inc. v. Hirschfeld, 224 Conn. 240, 248, 618 A.2d 506, 512 (1992)).

The Credit Limit set forth in ¶3 of the Sack Note was for Sack's benefit (Sack Aff. ¶7; HMZ Amended and Restated Local Rule 56(a)1 Statement ¶1, acknowledging that Sack Note and Sack Security Agreement were "for the benefit of Sack in connection with Kasden's purchase of petroleum products.")   Sack waived any absolute limitation to Kasden's Credit Limit by continually extending credit to Kasden in excess of $2 million, at Kasden's request, for the duration of the five-year period which HMZ maintains was the term of the Sack Note and up to April 2010 (Sack Aff. ¶¶11-14).  Thus, Sack's current claim of approximately $6.9 million is secured by the security interest created by the Sack Security Agreement, Sack Note and the parties' course of performance.

The five-year period for repayment of advances outstanding on the five-year anniversary of the Sack Note (Sack Note ¶8) was also included for Sack's benefit (Sack Aff. ¶7).   To the extent this provision is construed by the Court as a termination date of the Sack Note and Sack Security Agreement, as argued by HMZ, then it, too, was waived by Sack's continual extensions of credit to Kasden, at its request, from and after December 14, 2005 to April 4, 2010.

## IV.
## EVIDENTIARY ISSUES

HMZ contends in its response to Sack's Local Rule 56(a)2 Statement (the "HMZ Response") that several of the statements made in Sack's Local Rule 56(a)2

Statement (the "Sack LR 56(a)2 Statement") are inadmissible hearsay (See HMZ Response ¶¶ 4, 5, 18). Sack will address each of the alleged hearsay statements separately.

Paragraph 4 of the Sack LR 56(a)2 Statement does not contain inadmissible hearsay. The affidavit testimony of Mr. Sack that is cited in this paragraph is proffered as his observations of the parties' conduct in doing business under the Sack Note and Sack Security Agreement and does not recount an out-of-court statement or assertion. See Dimovski v. Tolisano & Danforth, L.L.C., 2011 WL 1638051, at * 5 n. 5 (D. Conn. Apr. 28, 2011) (affiant's testimony as to his personal knowledge of someone else's actions in filling out forms was not hearsay because the third party's actions "were not an assertion of any kind" and were "reasonably read" as affiant's direct observations of the actions); SEC v. Benson, 657 F. Supp. 1122, 1130 (S.D.N.Y. 1987) (testimony of plaintiff's witnesses "as to matters of which they had personal knowledge and business records was not hearsay, nor was testimony concerning instructions given by defendant to others, which were "not hearsay, but conduct....").

To the extent Kasden's failure to give a written notice of termination under ¶¶9 or 19 of the Sack Note is considered non-verbal conduct intended as an assertion, Fed. R. Evid. 801(a)(2), it is nonetheless admissible. Kasden itself was, but by virtue of the Trustee's appointment, no longer is, a party to one of the adversary proceedings and motions for summary judgment. Although, technically, statements of a debtor's officers and directors are not binding on a trustee based on

privity, they are admissible under the "catch-all" exception to the hearsay rule, In the Matter of Teltronics, Inc., 29 B.R. 139, 165 (Bankr. E.D.N.Y. 1983), now found in Fed. R. Evid. 807.

Mr. Sack's testimony concerning the party for whose benefit certain note provisions were included in the Sack Note is also not hearsay. This testimony does not proffer any out-of-court statement or assertion, and in any event, is evidence of Sack's state of mind. Fed. R. Evid. 803(3).

Any contention that the parties' course of performance or conduct may not be considered by the Court because it is inadmissible hearsay is directly contradicted by C.G.S. §42a-1-201(3) and 42a-9-102(73), which specifically direct that the meaning of a security agreement can be determined based on course of performance.

Paragraph 5 of the Sack LR 56(a)2 Statement also does not contain inadmissible hearsay for the same reasons the statements in paragraph 4 of the Sack LR 56(a)2 Statement are not hearsay. In addition, Mr. Sack's statement that Kasden's Credit Limit was increased by Sack each time Kasden's outstanding balance exceeded $2 million (Sack Aff. ¶13) merely recounts Mr. Sack's observations of how Sack did business with Kasden under the Sack Note and Sack Security and is not properly considered a statement or assertion for hearsay purposes or is part of the parties' course of performance.

Paragraph 18 of the Sack LR 56(a)2 Statement concerns evidence of Kasden's intent that Sack was to remain secured for all of its outstanding advances

after December 14, 2005. The evidence is in the form of tacit or adoptive admissions by Bruce and Michael Deitch, on behalf of Kasden, in failing to voice any opposition to Mr. Sack's statements on several occasions after December 14, 2005, in the Deitches' presence, that Sack was secured (Sack Aff. ¶16, Ide Aff. ¶¶14-16).

Fed. R. Evid. 801(d)(2)(B) specifically provides that "a statement of which [a] party has manifested an adoption or belief in its truth" is a non-hearsay admission of a party-opponent. The accompanying advisory committee note to Rule 801(d)(2)(B) provides in pertinent part:

> When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue. The decision in each case calls for the evaluation in terms of probable human behavior.

Fed. R. Evid. 801(d)(2)(B) advisory committee's note. Whether silence qualifies as an adoptive admission is a factual determination for the jury. Phipps v. Comprehensive Community Development Corp., 2005 WL 287413, at * 13 (S.D.N.Y. Feb. 4, 2005). In introducing a non-hearsay admission of a party-opponent, statements of non-parties that otherwise might be hearsay are admissible if they are necessary to provide context for the party admission. See Arista Records LLC v. Lime Group LLC, 715 F. Supp. 2d 481, 503-04 (S.D.N.Y. 2010); U.S. v. Forbes, 2006 WL 2850412, at * 3 (D. Conn. Oct. 3, 2006).

Here, the Deitches' silence when one would reasonably expect them to protest Mr. Sack's statement that Sack was secured, if they in fact disagreed with

him, would make their silence an adoptive admission. The statements of Mr. Sack that Sack was secured are necessary to provide context for the adoptive admission. Although Kasden, as opposed to the Trustee, is no longer party to these proceedings, the silence of the Deitches when one would reasonably expect them to protest should be admissible under Fed. R. Evid. 807. See in the Matter of Teltronics, Inc., 29 B.R. 139, 165 (Bankr. E.D. N.Y. 1983).

To the extent it may be argued that any of the challenged statements in paragraphs 4, 5 and 18 of the Sack LR 56(a)2 Statement are inadmissible extrinsic evidence of the parties' intent, Sack submits that the terms of the Sack Note and Sack Security Agreement are not sufficiently unambiguous so as to preclude extrinsic evidence. A "contract is unambiguous if its language is clear and conveys the precise intent of the parties." In re Belak, 2010 WL 1839350, at * 1 (Bankr. D. Conn. May 6, 2010). See also Revson v. Cinque & Cinque, P.C., 221 F. 3d 59, 66 (2d Cir. 2000) ("[c]ontract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."). Correspondingly, "[a] contract is ambiguous if the parties' intent is not clear from its text." Id. When an ambiguous contract is at issue, the Court may consider "extrinsic evidence to resolve the parties' intent." In re Waters, 2010 WL 2940858, at * 2 (Bankr. D. Conn. July 23, 2010).

As Sack has demonstrated, the relevant provisions of the Sack Note and Sack Security Agreement actually support Sack's secured position for its current

claim.  At the very least, the language relied on by HMZ and the Trustee is anything but "clear" in conveying a "precise intent of the parties" or "definite and precise meaning" on the question presented to the Court.  Extrinsic evidence may therefore be considered.

Dated:   Bridgeport, Connecticut
         May 10, 2011

                    DEFENDANT
                    SACK DISTRIBUTORS CORPORATION

                    By:___/s/ Irve J. Goldman_____
                        Irve J. Goldman (ct02404)
                        Pullman & Comley, LLC
                        850 Main Street, P.O. Box 7006
                        Bridgeport, CT  06601-7006
                        Telephone 203 330 2000
                        Facsimile  203 576 8888
                        E-Mail: igoldman@pullcom.com
                        Its Attorneys

ACTIVE/71211.2/IJG/2456657v1